THE CLEVELAND ELECTRIC ILLUMINATING CO. *v.*
SCAPELL ET AL.

[Cite as Cleveland Electric Illuminating Co. v. Scapell
(1974), 41 Ohio Misc. 107.]

(Nos. 803,259 and 919,280—Decided January 21, 1974.)

Court of Common Pleas of Cuyahoga County, Probate Division.

*Messrs. Squire, Sanders & Dempsey* and *Mr. Alan P. Buchmann*, for the Iluminating Company.

*Mr. John K. Sullivan*, for National Engineering & Contracting Company.

*Mr. Frank Scapell* and *Mrs. Frank Scapell, pro se.*

*Messrs. Kelley, McCann & Livingstone* and *Mr. Stephen M. O'Bryan*, for city of Independence.

*Mr. John T. Corrigan*, prosecuting attorney, and *Mr. Fred F. Hilow*, for Treasurer and Auditor of Cuyahoga County.

*Mr. Earl T. Longley*, for city of Brecksville.

*Mr. William J. Brown*, Attorney General, *Mr. John T. Davidson, Mr. Larry R. Zingarelli* and *Mr. Richard A. Frye*, for Department of Natural Resources.


LOCHER, J. These actions were consolidated by the court and have to do with the construction by the Cleveland Electric Illuminating Company (CEI) of a proposed high voltage power line identified and known as the Valley-Harding line.

Case No. 803,259 in an action in appropriation for an easement over the lands of Frank and Matilda Scapell in Brecksville, Ohio. Case No. 919,280 is an action in injunction wherein the city of Independence joined by the city of Brecksville and the state of Ohio seek a temporary and permanent injunction against the CEI enjoining the construction of the power line.

The record in these combined cases comprises 2,900 pages and the exhibits admitted into evidence total 154, excluding individual numbering of many projector slides.

The CEI proposes to build the Valley-Harding power line on a 110 foot right-of-way beginning in Sagamore Hills and then proceeding westerly and northwesterly to the Harding substation in Cuyahoga Heights, a distance of approximately 9 miles. The route selected by CEI traverses the governmental entities of Sagamore Hills, Brecksville, Independence, Valley View, Brooklyn Heights, Cuyahoga Heights, Cleveland Metropolitan Park District, the Cuyahoga Valley Park and the state of Ohio.

The heights of the towers which support the 345 KV cables range from an average of 145 feet to a maximum of 260 feet—where the line crosses the Interstate 480 bridge. The energy to be transmitted via Valley-Harding is needed to adequately supply consumers of electrical energy situated in the industrial valley of the Cuyahoga River and the downtown of Cleveland, principally. There has been no challenge to the contention that more electrical power is required in those areas. Eventually, the program of CEI is to ring the entire area with a 345 KV line and to interconnect with a national grid system, the midwestern portion of which is known as ECAR (East Central Area Reliability Coordination Agreement Power System).

The Cleveland Metropolitan Park District has appeared in the capacity of friend of the court indicating its opposition and stating in part * * * "We are unalterably opposed to invasion of this part of the valley, which is within the area proposed for a national park, by lines which will have an adverse effect on environmental and ecological values."

The state of Ohio has not given its consent to the line going over the Ohio Canal. The state of Ohio objects, likewise, to the line crossing over the proposed Cuyahoga Valley Park, which park is to encompass an area of 23,000 acres toward the realization of which the state has appropriated $4,000,000 in the current biennium to be matched by $4,000,000 of federal funds as well as by Cleveland Metropolitan Park District and Akron Metropolitan Park District monies, the total expenditures envisaged to be in the amount of $35,000,000.

The court and counsel have made three visits to the various suggested routes, afoot and by auto. There is a wealth of beautiful scenery, impressive landscapes and a unique flood plain in the proposed Cuyahoga Valley Park as well as in the existing Metropolitan Park Districts of Akron and Cleveland, the parts of the Emerald Necklace viewed on the excursions described above.

The proposed "federal-state-park districts" project will be available to 3,000,000 Ohioans within one hour's drive from their homes.

Witnesses for CEI explain that in selecting a route the factors of adequacy, reliability, economics and aesthetics, represented by the acronym AREAS are considered. The adverse parties dispute the company's claim that the AREAS have been properly applied in regard to the choice of the route.

The costs of the route selected by CEI and the alternate routes are substantially equal except for alternative route No. 1 which parallels Interstate 77 and which would affect some 72 dwelling units located within 200 feet of the route. The other alternative routes and the proposed route affect substantially the same number of dwelling units within 200 feet of the right-of-way.

After there was opposition expressed to the proposed route, CEI hired Commonwealth Associates, Inc. of Jackson, Michigan to do a route study, focusing on environmental assessments, which study was completed January 3, 1973.

The planning committee of the city of Brecksville approved the proposed CEI route as did the planning commission of the city of Independence. Neither council approved the proposed route. Some of the foundations for the proposed towers in the city of Independence have been built without a permit from that municipality; 50 of the 80 parcels required for the line have been acquired representing 63 per cent of the right-of-way, gauged by distance.

CEI proposes to string the power lines on structures known as DELTA towers specially designed for a lesser visual impact, in the wooded sections traversed by the line. Several DELTA configurations are to be erected, but only one has been tested, fabricated by Meyer Industries of Redwing, Minn.—known as the tangent DELTA tower, generally considered the "weakest" tower. The test of the tangent tower was conducted July 24 and 25, 1973 in the Hagar City, Wisconsin plant yard of Meyer Industries. The tower passed muster in all respects save one portion of the insulator assembly known as the suspension insulator. The CEI witness testified that this part is being redesigned, the

casting is being remade whereupon further tests will be run. (Page 1489.)[1]

Whereas the failure to test all the DELTA configurations, particularly those requiring greater strength than the tangent tower, could be considered a serious blow to the construction of the overhead Harding-Valley line; nevertheless, the court feels it should consider and discuss other prerequisites of R. C. 4905.65 (B) which reads, in pertinent part, as follows:

"To the extent permitted by existing law a local regulation may reasonably restrict the construction, location, or use of a public utility facility, unless the public utility facility:

"(1) Is necessary for the service, convenience, or welfare of the public served by the public utility in one or more political subdivisions other than the political subdivision adopting the local regulation; and

"(2) Is to be constructed in accordance with generally accepted safety standards; and

"(3) Does not unreasonably affect the welfare of the general public."

Subsections (1) "necessity" and (3) "unreasonableness" must be read in relation to the proposed route. It is undisputed that more electric energy is needed; however, the alternative routes must be considered, and if one or more are found to be superior to the CEI choice, then the "necessity" for this particular line is brought into question.

THE WELFARE OF THE GENERAL PUBLIC

Addressing our discussion to subsection (3) "does not unreasonably affect the welfare of the general public," the 345 KV line should be viewed in concert with the course which it takes. The state of Ohio has not consented to an easement over the canal land property owned by it. Further, the Cleveland Metropolitan Park District has refused

---

[1]The court commends CEI for commissioning the design of more aesthetically pleasing towers and encourages the development of new structures. The oil derrick or "praying mantis" towers, hopefully, have had their day.

to grant permission to CEI to span its property. R. C. 4933.15 confers upon the electric companies the authority to enter and take land held by an individual or a corporation, "* * * unless such land is owned by and essential to the purposes of another corporation possessing the power of eminent domain * * *."

The state and the park district possess the power of eminent domain. Objectors, the state of Ohio and the Cleveland Metropolitan Park District are, therefore, insurmountable obstacles to the proposed CEI line and towers over the route chosen through the Cuyahoga River Valley.

The Cleveland Metropolitan Park District and the state of Ohio are inextricably intertwined with the general public for whom they exist and whom these bodies corporate serve. If the line is not congruent with the welfare of these public entities, it perforce is not consonant with the welfare of the general public.

What R. C. 4933.15 and the cases tell us is that where there exists a paramount public interest—the existing as well as the embryo park—that interest is preponderant and will prevail over the proprietary interest of the electric company. The priceless health and welfare of the 3,000,000 Ohioans to whom the park is accessible defeat the right of the utility to appropriate through eminent domain.

Now insofar as the Cuyahoga Valley Park is concerned, the 345 KV line should be discussed in conjunction with the equities of a park and the aesthetics which are indigenous to it versus the emphasis and preoccupation with the engineering and commercial aspects of the utility. Natural beauty, relatively unspoiled, is challenged by man's need for material and secular fulfillment with resulting violation of the park. Individual and collective commitment is called for.

Our nation is presently faced with an energy crisis. Those who espouse the theory that the United States of America should adopt a zero growth rate, thereby avoiding the problems of further industrialization are not realistic, in this court's view. It is evident that the demand of the future upon the environment will not lessen. Rather, they will escalate dramatically as great numbers of people

cluster in urban centers imposing greater and greater burdens upon all our resources demanding their wise use, conservation and preservation, including the land itself. Judicious planning of high tension rights-of-way go hand in hand with sound land policies.

To illustrate the magnitude of the problem—in 1970 approximately 6,000 square miles constituted the aggregate of power line rights-ofway, an area slightly smaller than the state of Hawaii. By the year 2,000, with increased power demands, the area required for rights-of-way and the towers will occupy land equal to the combined areas of the states of New Jersey and Connecticut. Something to ponder over, particularly when the earth's surface under the lines and towers is rendered partially sterile.

These statistics should persuade the power companies and the regulatory agencies that they have resisted too strongly, too predictably the alternative of undergrounding in selected areas of the transmission facilities. As the state of the art of undergrounding advances, and it has advanced in recent years, the disparity in cost between overhead and undergrounding reduces itself.[2]

Physical progress must be respectful and sensitive to life and to the rapidly diminishing area still open and available for wilderness, parks and recreation. Conversely, conservation and preservation measures must be in tune with the admitted need for enlarged, adequate electric energy supplies.

How do we accommodate the good life, its superabundance of material goods and services with the soul of men which has very significant, almost insatiable psychological needs which only Nature can satisfy? The city dweller longs for solitude and beauty, the trees—the sycamore, the cottonwood and sumac, the lovely flowers and the sturdy

---

[2]The experience of the city of Cleveland and the CEI anent the proposed overhead towers on our lakefront in the middle 1950's is a case in point. Everyone, including the utility now points with pride to the undergrounding of the CEI 132 KV line from its East 72nd Street generating station, in Cleveland, to the east brink of its Cuyahoga River Valley. There has been no breakdown during the entire history of the line.

114

weeds, the birds and their light music and graceful flight. Were the intangibles, these perishable resources and the millions of Ohioans who will draw refreshment and renewal from the Cuyahoga Valley Park given their day in court? Obviously, they were not in the courtroom; however, dedicated volunteers championed their cause by taking the witness stand and portraying the historical, botanical and cultural wonders of the Cuyahoga Valley encompassed by the proposed park.[3]

These stewards sense a mandate to preserve, to conserve; they envision an exodus of tired, nature starved people streaming into the park to enjoy the wonderful mysteries of nature in an uncluttered surrounding.

The court feels that to place the ecological issues in proper perspective we must conceive not in terms of decades or lifetimes but in terms of ages of ages. We must form an awareness of the long run, not the immediate, for once the high voltage line has violated the park, it will be there forever. And then it's too late! The presently existing intrusions should be systematically removed and the natural beauty and the wonders nature holds must be preserved for all time.

### ABUSE OF DISCRETION

R. C. 163.09 (B) provides as follows:

"* * * A resolution or ordinance of the governing or controlling body, council, or board of the agency declaring the necessity for the appropriation shall be prima-facie evidence of such necessity in the absence of proof showing an abuse of discretion by the agency in determining such necessity * * *."

CEI maintains that its corporate board acted in good faith in choosing the proposed route, and absent fraud or

---

[3]"Each life is precious—
    unto itself—
from the tiniest insect
    to the greatest tree * * *
Vigorously it must protect
    its right to be—
——and to become * * *"
        "To Those Who See" by Gwen Frostic.

abuse of discretion in such determination cannot be over-ruled by the court. The CEI is a monopoly. It has been given a valuable right and has been charged with tremendous responsibilities. It is under a stricture to provide adequate electrical energy for a vast number of customers. The public interest increases with a monopoly. Its actions and decisions through its duly constituted board of directors are gauged by a higher standard than those of the market place, for CEI is a quasi-public corporation.

In order to determine whether or not there has been an abuse of discretion the court must consider, as did the board of CEI the alternative routes. Applying commonly accepted criteria, this court is of the opinion that the route paralleling Interstate 77 denominated Alternative Route No. 1 in CEI exhibit 20, was properly rejected. However, Alternative Routes 2 and 3 follow already established corridors. CEI owns the abandoned railroad right-of-way north from the Juniper substation on which stretches an existing CEI 132 KV line. Whereas additional easements are required they need be only 55 feet in width in order to accommodate both lines, the 132 KV line and the proposed 345 KV. No. 2 is the least costly of all the routes considered. (See CEI Ex. 20, Ex. 56 of plaintiffs.)

A serious question of reliability has been raised by the company engineers by reason of this alternative route eminating out of Juniper, the CEI not wanting to place "all its eggs in one basket." The court suggests either under-grounding or bypassing the Juniper substation along the existing corridors. A combination of Alternative Route 3 and the proposed route is likewise feasible and avoids the proposed park.

Where a board of directors of a utility disregards alternative routes which the testimony shows are safe, feasible and meet the AREAS tests of adequacy, reliability, economics and aesthetics in favor of the proposed route which creates a new corridor over Ohio Canal land, Cleveland Metropolitan Park District and state of Ohio parks, the court feels an abuse of discretion has indeed occurred. Therefore, the prohibitions of R. C. Chapter 163 and R. C. 4905.65 (B) have been thwarted by the board of directors.

## MINIMUM ENVIRONMENTAL IMPACT

The Power Siting Act of 1972, R. C. Chapter 4906, a product of our Legislature, has no application until October, 1974. It sets standards of "minimum environmental impact." This legislation together with The Wilderness Act of 1964 passed by the Congress of the United States and other laws having to do with ecology demonstrate the interest and concern in this country in the environment. In this context it should be pointed out that Alternate Route No. 2 does cross the gorge of Tinkers Creek at approximately the former location of the old railroad trestle which was recently dismantled. Here, the court suggests an undergrounding.[4]

## ACCRUED COSTS

There is testimony that a considerable sum of money has been invested by CEI in the Valley-Harding line to date and to order its abandonment would be pecuniarily hurtful to the company. However, as late as June 1, 1972, the costs were under $15,000 (Ex. 15 of plaintiffs), at a time when CEI was already aware of the environmental problems and stiff opposition from the state, the Cleveland Metropolitan Park District, municipalities and citizen groups. Some construction costs were entailed for foundations when less than 50 per cent of the right-of-way had been acquired.

Expenditures authorized after the initial $15,000 mentioned above, have been undertaken at the CEI's peril.

The court orders and decrees as follows:

Case No. 803259, *CEI* v. *Scapell et al.*, is dismissed at the cost of CEI. The temporary restraining order heretofor granted is made permanent within the boundaries of the federal—state—metropolitan park district project in case No. 919280, *City of Independence et al.* v. *CEI et al.*

This opinion constitutes the court's findings in accordance with Rule 52 of the Civil Rules.

*It is so Ordered.*

---

[4] A natural gas pipe line is being currently installed at this very location with all the attendant "battlefield effects." Additional scars for the 345 KV line would not cause any appreciable mischief to the terrain.